JAMES W. GILMARTIN and BIRDIE M. YEAGER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Gilmartin v. Commissioner
Docket No. 9196-77
United States Tax Court
T.C. Memo 1984-194; 1984 Tax Ct. Memo LEXIS 478; 47 T.C.M. (CCH) 1532; T.C.M. (RIA) 84194; April 18, 1984
Wareham Seaman, Sr.,Belan Kirk Wagner,Wareham Seaman, Jr., and Ronald J. Babcock, for the petitioners. Rebecca T. Hill and Marshall W. Taylor, for the respondent. SCOTT MEMORANDUM *479 FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined deficiencies in petitioners' Federal income tax for the calendar years 1972 and 1973 in the amounts of $20,744 and $46,563, respectively. The issues for decision are as follows: (1) Is James W. Gilmartin (petitioner) the owner of a film entitled "Moonchild" for Federal tax purposes; (2) if the Court determines that petitioner is the owner of the film, did the transaction surrounding this acquisition have sufficient economic reality to be accorded the tax treatment which the form of the transaction would entitle petitioner to receive; (3) further, in the alternative, is the fair market value of the film "Moonchild" so low in relation to the stated sales price or the principal amount of the indebtedness for which petitioner purchased the film that he should be held to have no investment in the film; (4) further, in the alternative, was the film "Moonchild" placed in service by petitioner or by American Film Brokers, Ltd., in 1973 so as to entitle petitioner to claim depreciation with respect to the film in 1973 and, if so, the amount of depreciation; (5) further, alternatively, if petitioner had a depreciable *480 interest in the film "Moonchild," is he entitled to an investment credit with respect to this film; (6) whether petitioner had a long-term capital loss carryover to the year 1972 or should the claimed capital loss carryover be eliminated because petitioner received an additional $45,000 payment in the taxable year ended December 31, 1971, in connection with an installment sale made in 1970 which was not reported on his 1971 income tax return; (7) assuming petitioner did receive the $45,000 payment in 1971 and also an ordinary additional gain in that year, since assessment and collection of a deficiency are barred for 1971 by the statute of limitations, should any excess investment tax credit to which petitioner might be entitled in the year 1973 be offset by the barred deficiency for the year 1971 before determining the amount of investment tax credit carryback applicable to the year 1972; and (8) did respondent conduct an impermissible second inspection of petitioner's records for either the taxable year 1972 or 1973. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. During the taxable years 1972 and 1973, petitioners were husband and *481 wife and filed joint Federal income tax returns. During these years they resided in Sacramento, California. At the time of the filing of the petition in this case, petitioner James W. Gilmartin was a resident of Sacramento, California. At the time of the filing of the petition, petitioner's former wife, Birdie M. Yeager, was a resident of Lone Star, Texas. Petitioner is a dentist who has been licensed to practice since 1959. During 1972 and 1973, petitioner was practicing dentistry in Sacramento, California. For at least 10 years prior to 1972, petitioner had practiced dentistry and for a substantial portion of this time had practiced in Southern California. For the calendar year 1972, petitioner reported gross receipts from the practice of dentistry of $235,865 and a net profit of $43,954.67 from this source. For the calendar year 1973, petitioner reported $496,608 as gross receipts from the practice of dentistry and a net profit from this source of $173,177. Sometime prior to the fall of 1973, petitioner discussed with two other dentists whom he considered successful in the practice of dentistry, as well as successful in their investments aside from the practice of dentistry, *482 the possibility of investments he might make apart from his dental practice. These two dentists suggested that petitioner talk to a Mr. Michael Betterton who, they told petitioner, had expertise in investments in the motion picture industry. Later in 1973 petitioner did seek advice from Mr. Betterton. On Mr. Betterton's recommendation, petitioner spoke with Mr. Albert H. Landry with respect to purchasing a motion picture film and at least by November 1973 these discussions had progressed to the point that the film "Moonchild" was being discussed as a film possibly to be purchased by petitioner. Mr. Landry is and was at the time petitioner spoke with him president of American Film Brokers, Ltd. (AFB). AFB is a corporation organized under the laws of California which was incorporated in December of 1972. Prior to 1970, Mr. Landry was a marketing and financial officer for another company and previous to that time had been a marketing and regional director for a pharmaceutical company. In 1970, Mr. Landry was an officer and employee of an entity involved in distributing films in New Jersey as a fundraising vehicle for The Boy Scouts of America. These films were not feature motion *483 picture films. In 1973, Mr. Landry owned 42-1/2 percent of the stock of AFB, and Mr. Betterton owned an equal amount of the AFB stock. Mr. Betterton, Mr. Landry and Mr. Milan Smith were the directors of AFB. Mr. Landry was the president of AFB. He continued as a director and president of AFB through 1978. AFB was organized to acquire motion picture films with the intent of reselling each film acquired to a limited partnership, retaining distribution rights. As of November 30, 1973, AFB had acquired five films. Mr. Landry's speciality with AFB was the distribution of films to the television industry and to hotels for use on closed circuit television. Mr. Betterton and a Mr. Ray Axelrod dealt with the theatrical bookings of the films to which AFB had distribution rights. From the time of the formation of AFB through November 30, 1974, Mr. Landry and Mr. Betterton each continued to own 42-1/2 percent of the stock of AFB. Later, Mr. Landry purchased some of Mr. Betterton's stock and by November 30, 1976, Mr. Landry owned 74 percent of the stock of AFB. By November 30, 1978, he owned 100 percent of this stock. Sometime prior to November 2, 1973, Mr. Betterton, on behalf of *484 AFB, had been discussing the possible purchase and subsequent distribution by AFB of a film entitled "Moonchild." Under date of November 2, 1973, a letter was addressed to Mr. Betterton, vice president of AFB, by Peter J. Morton on stationery of Consolidated Film Industries (CFI). This letter referred to an understanding reached with respect to the purchase and subsequent distribution of the feature motion picture "Moonchild." It referred to an amount of $15,000 to be sent to CFI, along with a fully executed promissory note for the money outstanding after deducting the $15,000 payment payable in installments, the first $5,000 principal installment to be paid on January 31, 1974. Under date of January 17, 1974, on stationery of CFI, a letter signed by Stan Salter, director of credit and collections, was addressed to Mr. Betterton at AFB stating that the promissory note mailed to Mr. Betterton on November 2, 1973, had not been received and requesting that immediate attention be given to finding and returning the original of the note. Under date of December 31, 1973, AFB, by Mr. Landry as president and Mr. Betterton as vice president, executed a note for $14,483.81 to Republic Communications, *485 Inc., Consolidated Film Industries Division, payable in four equal installments of $2,896.76 principal plus interest, the installments to be paid on February 28, March 31, April 30, May 31, 1974, and a final installment in the amount of $2,896.77 principal plus interest to be paid on June 30, 1974. This note was marked "Payment received 6-10-74, Consolidated Film Industries, A Division of Republic Corp.," and was returned to Mr. Landry at AFB by Mr. Salter of CFI as an enclosure to a letter dated July 23, 1974. Under date of November 30, 1973, Mr. Landry and Mr. Betterton, on behalf of AFB, executed a document entitled "Letter of Warranty" which was stated to be-- In connection with that certain sale this date of the film "Moonchild" ("the Film") to The Moonchild Company, a limited partnership ("Buyer") by the undersigned, as the principal officers, founders and stockholders of Seller * * *. This letter of warranty stated that the seller's confidence in the film was sufficient, that the seller agreed that if immediately prior to the date of the last scheduled principal payment under its purchase money note to seller-- (i) Buyer shall have made all prior scheduled payments *486 when due and as called for under said note. (ii) Buyer shall not have terminated that certain Agreement for Promotion and Distribution of the Film entered into this date between Buyer and Seller and (iii) the Film has not generated sufficient revenues to pay the last scheduled principal payment due under said note: 1. Interest payments will be suspended. 2. Seller will enter into negotiations concerning payment of the remaining principal. 3. If a negotiated settlement cannot be reached that is satisfactory to Buyer and Seller, Seller agrees to accept, if tendered by Buyer, the negative and all rights to the film as final and total payment of any remaining principal. A document entitled "Motion Picture Purchase and Sale Agreement" with respect to the sale of the film "Moonchild" to AFB was signed by Mr. Betterton on behalf of AFB and by Richard Alexander on behalf of Alexander, Gadney and Alston, Inc. (AGA, Inc.). The first paragraph of this document stated: THIS AGREEMENT is made the 17th day of December, 1973, by and between Alexander, Gadney and Alston, Inc. ("Seller") and AMERICAN FILM BROKERS, LTD., a California Corporation, ("Buyer"). The document *487 recited that the seller had caused a film entitled "Moonchild" to be produced and desired to sell all of its right, title and interest in and to the film to the buyer, and the buyer desired to purchase the film. The document then stated that the seller agreed to sell and the buyer agreed to buy all right, title and interest of the seller of any kind and nature in and to the film of approximately 90 minutes' duration, together with full ownership of the original color negative. The document further recited that "Seller acknowledges that Buyer is purchasing the Film for resale to The Moonchild Company, a limited partnership ("Partnership")." The document recited that the terms of payment were that the buyer should enter into an agreement with CFI to pay in full a laboratory bill of $34,483.81 plus interest owed by the seller on the film. It further recited that the execution of the agreement of AFB to pay the laboratory costs of the film owed to CFI shall constitute consideration for the sale. The agreement further provided that the balance of the purchase price of the film shall be payable to the seller only from net proceeds, if any, distributed to the buyer from the partnership. *488 The payments were to be made from 20 percent of the proceeds distributed to the buyer until the buyer had recovered all of the funds paid for the laboratory costs, and then the buyer was to pay the seller sums equal to 70 percent of the net proceeds distributed to the buyer from the partnership until the seller had received an aggregate of $275,000, including the amounts paid for the laboratory costs. Thereafter the buyer was to pay the seller sums equal to 50 percent of net proceeds distributed to the buyer from the partnership until the seller had received an additional $100,000. After that, the buyer was to pay to the seller 30 percent of all further net proceeds distributed to the buyer from the partnership. The document defined gross proceeds and net proceeds and other terms and provided that the buyer warranted to the seller that, pursuant to agreement to be entered into between the buyer and the partnership, the buyer would receive a cash distribution from the partnership of 50 percent of the first $980,000 of net proceeds and 35 percent of the balance of net proceeds. The agreement carried provisions for audit of the buyer's books by the seller and the seller's warranties *489 that the seller was the lawful owner of the film and had marketable title thereto. It also provided for the amount to be allocated to the film "Moonchild" if the film was shown in conjunction with another film and further provided that the seller retained the right to approve any production or editorital changes to the film and a provision that in all advertising and publicity under the buyer's control the producer and writer-director of the film would receive equal size and type billing credits. It also provided that the buyer granted the right to the producer and writer-director of the film to purchase from the buyer one 35mm and one 16mm color composite release print of the film for their personal noncommercial use which would not be shown to more than five people at one time. The agreement provided that it should be binding upon and inure to the benefit of the parties and their respective successors and assigns. Richard L. Alerxander produced the film "Moonchild." The filming of the movie was at the Mission Inn in Riverside, California, and took 3 weeks in July 1971. Subsequent to that filming there were 3 days of pickup shots. The production cost of the film "Moonchild" *490 was approximately $161,000, which cost included the $34,483.81 laboratory fee which was paid, as above set forth, by AFB to CFI. An actor, John Carradine, had the leading role in the film "Moonchild." Mr. Carradine was an actor who had starred in over 400 movies over the 57 years preceding the filming of "Moonchild." Mr. Carradine had at times worked for all of the major motion picture studios and, during his career, had worked with a number of leading actors and actresses. He had parts in some outstanding films during the years preceding the filming of "Moonchild." Victor Buono costarred with Mr. Carradine in the film "Moonchild." Mr. Carradine worked in the production of "Moonchild" for less than 4 weeks at a compensation of $1,500 a week. Mr. Buono also worked less than 4 weeks on the production of "Moonchild" and was paid $1,500 a week for his work. In March 1972, AGA, Inc. had entered into an agreement with Filmarkers, Ltd. (Filmarkers) which provided that in consideration for Filmakers' financing the production costs of "Moonchild," Filmakers was to receive a percentage of the gross income from "Moonchild" and was to have certain rights with respect to approving the advertising *491 and distribution of the film "Moonchild." Under the agreement also, an officer of Filmakers was to be credited as the executive producer of the film "Moonchild." As part of this agreement, articles of limited partnership were entered into between AGA, Inc. and Filmakers for the production and distribution of the film "Moonchild." AGA, Inc. was the general partner. The agreement contained certain limitations on the general partner's right to mortgage, pledge or convey the film without the consent of Filmakers. After Richard Alexander entered into the agreement with AFB for the sale and distribution of the film "Moonchild," a question was raised by officers of Filmakers, particularly Donald G. Wizeman, Jr., president, as to the authority of Mr. Alexander on behalf of AGA, Inc. to enter into this agreement. Sometime in early 1974, a representative of Filmakers agreed to the contract which had been made by Mr. Alexander on behalf of AGA, Inc. with AFB in regard to the film "Moonchild." The copyright on the film "Moonchild" is in the name of AGA, Inc. The first print of "Moonchild" was received in May 1972 and it was submitted for an award but did not receive one. The film was first *492 shown to potential distributors in May 1972 at a screening in Virginia Beach, Virginia. No potential distributors were obtained as a result of this showing. Thereafter, "Moonchild" was shown to major studios, major distributors and to certain secondary film distribution representatives, but none of the screenings with these distributors resulted in distribution agreements. "Moonchild" was also shown to a representative of a major television network without any distribution agreement being obtained. Mr. Alexander thereafter hired a producer's agent who was able to negotiate an agreement for a predistribution of the film in order to obtain a possible distribution of the film by a firm in New York called CineGlobe. An agreement was entered into with CineGlobe, but that company never arranged any showing of the film except at the Cannes Festival and the agreement was canceled. None of the various distributors that screened "Moonchild" made an offer to fund an advance to the producer for the right to distribute the film "Moonchild." In May 1973, Mr. Alexander, on behalf of AGA, Inc. and the limited partnership that included Filmakers, arranged to have a showing of the film "Moonchild" *493 at a Fox Theater in Riverside, California, owned by General Cinema. The showing was under the sponsorship of the Parapsychology Association of Riverside and an admission charge was made. The club sponsored the film in order to raise funds for the club and to gain some broader publicity by having such an event sponsored by the club. AGA, Inc. participated in the showing of the film in Riverside, California, in order to make a profit as well as to gain some further exposure for the film. The agreement between the club and AGA, Inc. was that after the theater rental was paid, AGA, Inc. was to receive 65 percent of the net proceeds. The showing was advertised as a premiere or preview of the film. It was advertised in the local Riverside paper, in a paper published by the Parapsychology Association and in fliers distributed by members of the Parapsychology Association. The advertisements showed the price of tickets and that the general public was invited to attend. There was a ticket boxoffice at the theater for sale of tickets.Tickets were also sold by members of the Parapsychology Association. The film "Moonchild" was shown at the Riverside Theater for five evenings, from May 5 *494 to May 10. There was good attendance on the opening night and poor attendance thereafter. The limited partnership that owned the film received a net of $1,700 from the five nights' showing. AGA, Inc. filed partnership returns of income on behalf of the limited partnership for the years 1973 through 1978. On these returns the partnership claimed a deduction for depreciation of the film "Moonchild." On the partnership return of income filed for the period ending July 31, 1974, the partnership claimed an investment tax credit on the film "Moonchild." In late 1973, the laboratory to which approximately $34,500 was owed on the film "Moonchild" was threatening to foreclose its lien on the film. Mr. Alexander, having attempted unsuccessfully for over a year to obtain distribution of "Moonchild" felt impelled to enter into some agreement acceptable to the laboratory for satisfaction of the unpaid bills to avoid total loss of the film. It was for this reason that he entered into the agreement heretofore set forth for the sale of the film to AFB. The film "Moonchild" was a cult-type film, primarily suitable for showing in art theaters and to the college market. It was not a general *495 release film. There are between 150 and 200 art theaters in the country. The specialized markets for the film "Moonchild" substantially limited its potential gross from distribution. The fact that a producer has shown a film to a number of distributors who have rejected the film adversely affects the value of the film. The discussions held between representatives of AFB and petitioner in late 1973 culminated in four agreements being entered into between them. One of these agreements was entitled "Agreement for the Purchase and Sale of a Motion Picture Film." This agreement was signed by Mr. Landry and Mr. Betterton on behalf of AFB and signed by petitioner on his own behalf. The first sentence of this agreement reads: THIS AGREEMENT is made effective this 30th day of September, 1973, at Sacramento, California, by and between AMERICAN FILM BROKERS, LTD., a California Corporation, ("AMERICAN") and JAMES W. GILMARTIN, D.D.S., ("BUYER"). The agreement recited that the buyer agreed to purchase and AFB agreed to sell to the buyer all right, title and interest in and to the motion picture "Moonchild" produced by Mr. Alexander and directed by Mr. Gadney, including all copyrights *496 pertaining to said film and its music, if any, and all intangible and tangible property related thereto. The consideration recited for the picture was $490,000, payable $34,300 in cash with the balance to be paid with interest at 5 percent, principal payments to be made as follows: June 30, 1974
$20,000
June 30, 1975
15,000
June 30, 1976
10,000
June 30, 1977
5,000
June 30, 1978
2,000
June 30, 1979
2,000
June 30, 1983
401,700
It provided that interest would be payable "on December 15 of each year for the years 1973 through and including 1979," calculated on the unpaid balance, the buyer having the right to prepay principal payments at any time. The agreement further provided that the buyer agreed that until the principal balance was paid in full-- BUYER shall pay to [AFB] from time to time as received, fifty percent (50%) of all Net Proceeds * * * and fifty percent (50%) of proceeds received by BUYER from any sale of the film reduced by expenses of sale. * * * The agreement further recited that the parties had entered into an agreement for promotion and distribution of the film of even date, and in the event the distribution agreement *497 should be terminated by the buyer without cause, without the prior written consent of AFB, the whole sum of principal and accrued interest should become immediately due and payable. The definition of net proceeds was the gross proceeds after that reduction to apply to the expenses incurred in leasing, licensing, distribution or any other dealings with the film and the administrative expenses, limited to a maximum amount of $50,000. Vendor's expenses were stated to include actual cost of prints and advertising (trailers, press books, etc.), limited to a maximum of $60,000. The agreement also provided that payment of the purchase price should be secured by a security agreement creating a security interest in the film together with a financing statement evidencing the security agreement. The agreement contained warranties by AFB that it was the lawful owner of the film and had a valid, marketable title thereto, free and clear of all claims, liens, pledges or encumbrances and could convey all pertainent copyrights free and clear of any and all claims; that AFB shall deliver such other documents of conveyance as shall be deemed necessary; that the agreement shall be binding on the parties *498 and their successors or assigns, but that the agreement could not be assigned without the prior written consent of the other party. A document entitled "Agreement for Promotion and Distribution of a Motion Picture Film," which was signed by Mr. Landry and Mr. Betterton on behalf of AFB and by petitioner on his own behalf, recited in the first paragraph the following: THIS AGREEMENT is made this 30th day of September, 1973, by and between AMERICAN FILM BROKERS, LTD., a California Corporation, ("AMERICAN") and JAMES W. GILMARTIN, D.D.S., ("GILMARTIN"). This agreement recited that petitioner had acquired all rights to the film "Moonchild" and AFB desired to render its services to petitioner to promote, distribute and market the film. The agreement provided that in consideration of the mutual convenants, petitioner agreed to retain AFB to use its best efforts to market, lease, license, promote, distribute and otherwise deal with the film both domestically and internationally, with the intent of obtaining therefrom a profit for petitioner. As consideration, the agreement a provided: In consideration of AMERICAN'S [AFB] agreement to act as promoter and distributor for the *499 FILM, GILMARTIN agrees to pay to AMERICAN an initial management fee equal to the sum of Twenty Nine Thousand Three Hundred Dollars ($29,300.00) payable upon the execution hereof. The agreement further provided that after petitioner had paid for the film in full, he would pay to AFB 35 percent of gross proceeds from distribution of the film with all further expenses of promotion and distribution to be borne by AFB. It provided that petitioner agreed to reimburse AFB from the proceeds of the film for cost of prints and the like to the extent of $60,000 and for promotion cost to the extent of $50,000. The agreement provided that it shall be binding upon and inure to the benefit of the parties, their respective heirs, successors and assigns, but that AFB might not assign any of its rights or delegate its duties without the prior written approval of petitioner. The agreement also provided that petitioner shall have the right to terminate the agreement at any time. A document entitled "Security Agreement" was also signed by Mr. Landry and Mr. Betterton on behalf of AFB and by petitioner on his own behalf. This agreement bore the date of September 30, 1973, and provided in *500 pertinent part as follows: JAMES W. GILMARTIN, D.D.S. ("DEBTOR"), hereby grants to AMERICAN FILM BROKERS, LTD., A California Corporation ("SECURED PARTY"), a security interest in that certain motion picture film entitled "Moonchild", and fifty percent (50%) of the proceeds thereof, to secure the payment of Four Hundred Fifty Five Thousand Seven Hundred Dollars ($455,700.00) to SECURED PARTY as provided in that certain Agreement of Purchase and Sale of even date herewith. Default in payment pursuant to the terms of said Agreement of Purchase and Sale is a default under this Agreement. If such default is not secured within thirty (30) days after notification by SECURED PARTY to DEBTOR of said default in payment, SECURED PARTY may declare the entire balance immediately due and payable and shall have the remedies of a secured party under the Uniform Commercial Code. On the letterhead of the law offices of Seaman and Seaman, Wareham Seaman and Wareham Seaman, Jr., a letter signed by Wareham Seaman, Jr., bearing the date of December 31, 1973, was addressed to Mr. Landry, president of AFB, and marked "Re: 'Moonchild'." The body of this letter read as follows: Enclosed is Dr. Gilmartin's *501 check for $69,300 in payment of his present obligation under the Agreement of Purchase and Sale and the Agreement of Promotion and Distribution. We would like to set forth a memorandum of several further points of agreement we came to at the time of [sic] the aforementioned Agreements were entered into, and as additional consideration therefor. The first item pertains to our concern about the possible adverse tax consequences to Dr. Gilmartin should some of tax considerations set forth in the opinion letter end up not being the case as far as the Internal Revenue Service is concerned after auditing Dr. Gilmartin. Accordingly, we agreed that if any of the expected tax treatment as set forth in the March 15, 1973 opinion letter * * * is challenged by the Internal Revenue Service in reference to Dr. Gilmartin, Dr. Gilmartin shall have the right to surrender to you all his rights in the film "Moonchild" whereupon he shall be excused from further payment or other performance under the Agreement of Purchase and Sale and collateral agreements of September 30, 1973. This right may be exercised anytime after such challenge by Internal Revenue Service, so long as there remains any *502 sums owing under the Agreement of Purchase and Sale. However, Gilmartin agrees to pay all sums otherwise due and payable during 1974, regardless of any action by Internal Revenue Service. The second item pertains to your warranty in connection with your confidence in the film and your method of marketing and distribution. You have agreed that if immediately prior to the date of the last scheduled principlal payment under the Agreement of Purchase and Sale (1) Gilmartin shall not be in default in the terms of payment thereunder; (2) Gilmartin shall not have terminated the Agreement for Promotion and Distribution and (3) the Film has not generated sufficient revenues to pay the last scheduled principal payment due under said note, then: (a) American [AFB] will enter into negotiations concerning payment of the remaining principal; and (b) if a negotiated settlement cannot be reached that is satisfactory to both parties, American agrees to accept, if tendered by Gilmartin, the negative and all rights to the film as final and total payment of any remaining principal. This warranty is to be irrevocable and is coupled with any interest and shall inure to the benefit of Gilmartin, *503 his heirs and assigns and shall be binding upon American, its successors and assigns. If this conforms to your understanding of our agreement in this regard, I would appreciate your acknowledging such on the enclosed extra copy of this letter and returning it to me. This letter contained the approval signatures of petitioner and of Mr. Landry on behalf of AFB. Other than the three documents discussed above, no agreements were entered into between AFB and petitioner regarding the film "Moonchild." AFB did not furnish petitioner with the production or distribution record of the film "Moonchild" during the negotiations for the sale of the film, and petitioner did not inquire whether the film had been distributed prior to his entering into the agreements with AFB. Petitioner paid to AFB $69,300 by a check dated December 31, 1973. Under date of April 17, 1974, Mr. Betterton, on behalf of AFB, wrote a letter to petitioner suggesting that his payments be changed to a quarterly basis. In this letter and a number of subsequent letters from AFB to petitioner extending through 1977, the tax benefits of the purchase by petitioner of the film were pointed out, and in some of *504 these letters the amounts of tax deduction were stated.The following schedule lists the payments made by petitioner with respect to the film "Moonchild": Check
Date
Payee
No.
Amount
5/10/74
American Film Brokers, Ltd.
3520
$6,343.50
6/19/74
American Film Brokers, Ltd.
3581
10,572.50
10/21/74
American Film Brokers, Ltd.
3648
10,572.50
12/12/74
American Film Brokers, Ltd.
3723
10,472.50
4/11/75
American Film Brokers, Ltd.
3826
9,102.50
7/1/75
American Film Brokers, Ltd.
3911
9,102.50
10/9/75
American Film Brokers, Ltd.
4003
9,102.50
12/4/75
American Film Brokers, Ltd.
4062
9,102.50
3/25/76
American Film Brokers, Ltd.
4185
7,697.50
7/14/76
American Film Brokers, Ltd.
4269
7,697.50
9/16/76
American Film Brokers, Ltd.
4306
7,697.50
12/17/76
American Film Brokers, Ltd.
4364
7,697.50
4/14/77
American Film Brokers, Ltd.
4416
6,352.50
7/11/77
American Film Brokers, Ltd.
4456
6,352.50
After making the payment on July 11, 1977, petitioner made no further payments because, in his opinion, he was not required to do so under the warranty letter dated December 31, 1973. The first booking obtained *505 for the film "Moonchild" by AFB was in June 1974. As of October 15, 1974, the total of the film rentals for "Moonchild" received from the distribution of the film by AFB was $1,632.90. Of this amount, $1,103.24 was the distributor's share and $367.21 the subdistributor's percentage. The amount of $144.74 was paid for advertising. As of January 18, 1977, the total of the film rentals received from the film "Moonchild" under AFB's distribution agreement was $17,428.43, of which $10,689.15 was the distributor's share and $2,959.80 was the subdistributor's percentage. The amount of $3,028.28 was paid for advertising expense. Many of the rentals received for "Moonchild" were flat rentals of amounts of around $35 or less. There were some flat rentals as low as between $2.50 and $5.25. As of September 30, 1977, the total distribution income AFB had received from the film "Moonchild" was $20,005.40 and the total expenses related to the distribution of this film were $48,561.18. Prior to petitioner's entering into the agreement with AFB for the purchase of the film "Moonchild," he had been shown a letter dated March 15, 1973, addressed to Mr. Landry as president of AFB which was *506 a tax opinion dealing with acquisitions of motion pictures by limited partnerships. The letter is 31 pages long.It contains a detailed discussion of the author's conclusion as to the tax effect of a partnership's purchasing a motion picture film in contemplation of the partnership's making the payments out of the net profits earned from the distribution of the film. The opinion is also predicated on the fact that the partnership will receive a warranty from AFB that if, by the end of the eighth year, the film has not generated sufficient earnings to pay the then remaining principal due and a settlement satisfactory to both parties cannot be reached, AFB will accept the negative and all rights to the film as the final and total payment of the remaining principal. An agent of the Internal Revenue Service came out and inspected petitioner's books and records for the years here in issue at the office of petitioner's accountant. After this inspection of the books, the agent returned and asked the accountant to furnish the records to him for further inspection. The accountant called petitioner's attorney and asked the attorney what he should do. The attorney advised the accountant to *507 release the records to the agent since the agent could obtain them by subpoena if he did not. After receiving this advice the accountant released the records for what he considered a second inspection by respondent's agent. No subpoena for the records was ever issued and no action of any kind was ever brought by or on behalf of petitioner to prohibit the agent from obtaining the records. Attached to petitioner's return for the year 1973 was a Schedule C, Profit (or Loss) From Business or Profession, which showed the principal business as being the rental of a movie film. The gross receipts and total income were shown as none, depreciation claimed was $28,300, interest on business indebtedness claimed was $5,700, management fee paid to AFB was shown as $29,300, making a total claimed deduction of $63,300, which was shown as a loss. On this return petitioner claimed an investment tax credit of $20,261 computed on new property of $499,483.20, and included in that category was the film "Moonchild." Respondent in his notice of deficiency disallowed $28,542 of the $29,300 management fee claimed by petitioner to be deductible on his return, explaining that-- the amount of $29,300.00 *508 paid as a management fee represents an asset having a useful life which extends substantially beyond the close of the taxable year ended December 31, 1973, * * * the $29,300.00 is ratably deductible over the period from acquisition of the film to the date of final payment, September 30, 1973 through June 30, 1983, a period of 116 months.* * * Respondent disallowed $26,585 of the depreciation deduction claimed by petitioner with the explanation that the stated purchase price of $490,000 with a downpayment of $34,300 was a contingent liability except to the extent of the $34,300 initial payment, and therefore any amount in excess of the $34,300 did not represent a part of the depreciable base.
In computing petitioner's capital gain for the calendar year 1972, respondent disallowed a long-term capital loss carryover of $3,681 claimed by petitioner, stating that petitioner had received a $45,000 installment payment in the calendar year 1971 in connection with a sale made in 1970, and when the additional payment is taken into consideration in arriving at reportable ordinary income and capital gain on the installment sale for the year 1971, there is no remaining long-term capital loss *509 in 1971 to carry over to the year 1972.Respondent also determined that the allowable investment credit for the year 1972 is limited to the amount of credit applicable to assets acquired in that year since there was no investment credit carryback available from the year ended December 31, 1973, because when adjustments are made to the amount of credit determined to be appropriate for the year 1973 the entire investment tax credit was absorbed by income tax for the taxable year 1973. For the calendar year 1973, respondent determined that petitioner's total qualified investment for investment tax credit purposes was $20,702, with an investment tax credit of $1,449. In making this adjustment, respondent eliminated $486,000 of the amount claimed as qualified investment with respect to the cost of a motion picture film. By amendment to answer filed pursuant to leave granted by the Court, respondent alleged (1) that petitioners did not purchase the film "Moonchild" in 1973 since the burdens and benefits of ownership of the film did not pass to petitioners in that year, and that petitioner was no the owner of the film "Moonchild;" (2) that if the Court determines that petitioner did purchase *510 the film in 1973, it was not placed in service within the meaning of section 1.167(a)-10(b), Income Tax Regs., by petitioner until 1974 and therefore no depreciation or amortization is allowable for the year 1973; and (3) that the disallowance by respondent of investment tax credit on the film "Moonchild" is mandated by sections 46(c) and 48(k)(1) [1] in that (a) if petitioner has an ownership interest in the film, this interest is not in excess of the cash invested by petitioner in 1973; (b) the film was publicly exhibited for entertainment purposes prior to September 30, 1973, and thus was not "new section 38 property" on or after September 30, 1973; and (c) the film "Moonchild" was not publicly exhibited by petitioner or AFB in 1973 and thus was not placed in service by either of them until 1974.[2]
*511 OPINION Although the parties first discussed the issue of whether petitioner was the owner of the film "Moonchild" for Federal tax purposes, in the Court's view it is more appropriate to begin with the issue of when petitioner acquired whatever rights he did have in the film "Moonchild." In order to make this determination, it is necessary to consider five documents which are in the record. The first such document is the agreement entered into by Mr. Alexander on behalf of AGA, Inc. and AFB with respect to the sale of the film by AGA, Inc. to AFB. This agreement is dated December 17, 1973. The second document to be considered is the document entitled "Agreement for the Purchase and Sale of a Motion Picture Film." The first sentence in this document reads: "THIS AGREEMENT is made effective this 30th day of September, 1973, * * * by and between AMERICAN FILM BROKERS, LTD., * * * and JAMES W GILMARTIN, D.D.S." This is the document that recites that Dr. Gilmartin agrees to purchase and AFB agrees to sell the motion picture film entitled "Moonchild." The third document is entitled "Agreement for Promotion and Distribution of a Motion Picture Film." This document recites that "THIS *512 AGREEMENT is made this 30th day of September, 1973, by and between AMERICAN FILM BROKERS, LTD., * * * and JAMES W. GILMARTIN, D.D.S." This document provides for the distribution by AFB of the film "Moonchild" for petitioner and provides for payment for such distribution. The next document is entitled "Security Agreement." Right beneath the title of this document are the words "dated: September 30, 1973." By this document, petitioner grants to AFB a security interest in the motion picture film "Moonchild" and 50 percent of the proceeds thereof to secure repayment of $455,700. The final document in this series is a letter dated December 31, 1973, to Mr. Landry as president of AFB, signed by an attorney for petitioner. This letter recites that "Enclosed is Dr. Gilmartin's check for $69,300 in payment of his present obligation under the Agreement of Purchase and Sale and the Agreement of Promotion and Distribution." It is this letter that sets forth the agreement with respect to payment ceasing if the deductibility of certain items for tax purposes is challenged by the Internal Revenue Service, and provides that the final payment of $401,700 stated in the Agreement for the Purchase *513 and Sale of a Motion Picture Film to be due on June 30, 1983, would be satisfied by Dr. Gilmartin's tendering the negative and all rights to the film "Moonchild" to AFB if the film had not generated sufficient revenues to pay the last scheduled principal payment due on the film. In our view, the very fact that no payment was made by petitioner with respect to the film "Moonchild" until December 31, 1973, when a check dated that day for $69,300 was stated to be enclosed with a letter, and that this letter which was approved on behalf of AFB by Mr. Landry contained substantial provisions with respect to the agreement between the parties, is a clear indication that the actual agreement between petitioner and AFB was not entered into until December 31, 1973. However, there are further indications to this effect in the record. A substantial indication that the agreement of purchase and sale was not entered into between petitioner and AFB until December 31, 1973, is the fact that AFB had not itself purchased the film "Moonchild" until December 17, 1973, and in that purchase agreement the recitation is made that AFB is planning to sell the film to a limited partnership. The fact that *514 the purchase and sale agreement recites that it is "made effective this 30th day of September, 1973" is indicative that the actual agreement was entered into on some other date. We have not overlooked the fact that the agreement for promotion and distribution of the motion picture film states that it is "made this 30th day of September, 1973" and the security agreement is dated September 30, 1973. However, both of these agreements are conditioned upon the purchase and sale agreement which merely recites that it is effective as of September 30, 1973. It is our view that the dates on the distribution agreement and the security agreement were merely made to conform with the "effective" date of the purchase and sale agreement. It is our conclusion that all of these agreements were actually executed in late December. Certainly AFB had no title to the film prior to December 17, 1973, to transfer to petitioner. On the basis of this record, we conclude that whatever rights petitioner purchased under the purchase and sale and related documents were obtained on December 31, 1973. Certainly there had been discussions between Mr. Alexander and Mr. Landry concerning the purchase by AFB *515 of the film "Moonchild" prior to December 17, 1973, as is indicated by certain correspondence placed in the record in this case. There is correspondence in the record that indicates that in early November 1973, Mr. Alexander and Mr. Betterton had some understanding that AFB would purchase the film "Moonchild." A letter dated November 2, 1973, from CFI addressed to Mr. Betterton is in the record. The first sentence of that letter reads: "We are pleased to confirm our understanding reached with regard to the purchase and subsequent distribution of the above referenced feature motion picture." The above-referenced motion picture is stated to be "Moonchild." This letter refers to a payment of $15,000 along with a fully executed promissiory note to be sent to CFI, for which CFI would release its lien for laboratory work on the film. However, there is nothing in the record to show that AFB agreed to the statement in that letter, and there is a letter dated January 17, 1974, in the record addressed to Mr. Betterton from CFI stating that to date the promissory note sent on November 2, 1973, had not been received. The promissory note, which was marked paid on June 10, 1974, is dated at Los *516 Angeles, California, December 31, 1973, and has a face value of $14,483.81, which indicates that a total principal amount of $20,000 previously was paid. It is not absolutely clear from these documents when the lien of CFI was released. However, it would appear that the release was on or about January 2, 1974, since on that date CFI addressed a letter to Mr. Betterton of AFB enclosing a photocopy" of our UCC-2 form as required by our agreement which terminates our first position security interest under the financing statement previously filed on American Media Productions." Further evidence that petitioner purchased whatever rights he had to the film "Moonchild" on December 31, 1973, is a letter dated May 6, 1974, addressed to petitioner by Mr. Betterton stating-- Because there seems to be some question in your mind about the amount of payment and when it is due, I am forwarding a copy of Page Two of the Purchase and Sale Agreement entered into last December. As you will see, you do have a $20,000 payment due on June 30 of this year. * * * This certainly indicates that at least Mr. Betterton was of the opinion that the purchase and sale agreement was entered into in *517 December 1973. The record certainly shows that petitioner had negotiations with representatives of AFB for the purchase of a motion picture film well in advance of December 1973. In fact, the record is clear that AFB only bought films for resale primarily to limited partnerships and that these resales were based on assurances to the purchasers of tax deductions in each of the first several years after purchase substantially greater than the amounts paid on the purchase price of the motion picture. However, there is nothing to show that there was any firm agreement that petitioner would purchase any interest in "Moonchild" until December 1973.In fact, AFB was in no position to sell any such rights until after December 17, 1973, when it acquired the motion picture. Any discussions between petitioner and AFB prior to that date could have, at most, been merely an agreement by AFB to sell an interest in "Moonchild" to petitioner if and when AFB acquired an interest in the motion picture. The question of when petitioner acquired whatever interest he had in "Moonchild" is one of fact. On the basis of the record, we conclude that petitioner purchased whatever rights he had to the film *518 "Moonchild" on December 31, 1973. We now address respondent's argument that petitioner was not the owner of the film "Moonchild" for Federal tax purposes. Respondent's argument in this regard is very confusing. Respondent argues that the five documents we have previously discussed should be considered together. Petitioner does not deny that these documents should be considered in relation to each other. Respondent then argues that these documents appear to convey to petitioner a right to obtain a copyright on the film and since "Moonchild" was not copyrighted in petitioner's name there was not a purchase of the motion picture by petitioner. As we read the agreements, which we have set forth in some detail in our findings of fact, they provide that petitioner buys all right, title and interest that AFB has in the film "Moonchild." The only reference to the copyright in the agreements is under warranties and representations of AFB. These representations are that AFB is the lawful owner of the film and has a valid marketable title thereto which it can convey to petitioner free and clear of any and all claims, liens, pledges or encumbrances. The agreement further requires AFB *519 to execute such further documents of conveyance and assignment as may be necessary, including the vesting of all copyrights in the name of the buyer. Certainly there is a provision that AFB has the right to convey the copyrights and that further documents vesting all copyrights in the buyer will be signed if necessary. However, there is nothing we see in the agreements that requires the film to be copyrighted in petitioner's name or that negates a sale if the copyright is not delivered to petitioner. Respondent next argues that the negative of the film was not delivered to petitioner. However, since AFB had signed a distribution contract with petitioner simultaneously with the signing of the sales agreement, to deliver the negatives to petitioner and have him return them to AFB would have been a useless gesture. For all this record shows, such a delivery and return may have occurred. Respondent has the burden of proof on this issue since the deficiency notice recognized petitioner's purchase of the film, questioning only the amount he paid therefor. Respondent further argues that since the distribution agreement was entered simultaneously with the sales agreement, the contract *520 is executory. We do not understand respondent's argument in this respect. The fact that petitioner entered into a distribution agreement with AFB meant that action on the part of AFB was required and services were to be rendered to petitioner by AFB for various stated considerations. In our view, however, this in no way detracts from the facts that petitioner had purchased whatever rights AFB had in the film "Moonchild" and that those film rights AFB sold to petitioner were of sufficient stature to cause petitioner to become the owner of the film. Respondent questions whether title to the film passed to petitioner.In our view, the contract is clear that title did pass to petitioner. Respondent further argues that petitioner had no unconditional liability to pay the purchase price. Petitioner paid over $34,000 of the purchase price upon execution of the purchase and sale agreement and had an unconditional obligation to pay another $20,000 in 1974. He was obligated to pay all the remaining purchase price except the $401,700 balloon payment unless the tax effects of the purchase were questioned by the Internal Revenue Service. Only if and when the Internal Revenue Service questioned *521 the tax effects of his purchase of the motion picture could be stop making any payments except the final payment. The fact that the only security given for the payments was the motion picture did not change the nature of petitioner's obligation to pay all except the last $401,700 of the purchase price. Petitioner had a substantial dental practice and may have had any number of sources from which the unconditional payments could have been collected. The provision that if the tax effects of the transaction were questioned by the Internal Revenue Service further payments would not be required did not apply to payments due in 1974. For a reasonable period of time thereafter the Internal Revenue Service would not have been expected to commence any investigation of petitioner's 1973 tax liability. In fact, petitioner made some payments through July 11, 1977. Only $9,000 of principal payments due, other than the balloon payment of $401,700, remained unpaid when petitioner ceased making payments. So, clearly, as respondent recognized in the notice of deficiency, there was some payment for the film by petitioner. A separate issue raised by respondent, and in fact raised by the notice *522 of deficiency and petitioners' petition, deals with the amount paid for the film by petitioner. Respondent's argument that petitioner did not have an unconditional liability to pay the purchase price for the film does not apply to the entire purchase price.As we have pointed out, petitioner did have an unconditional liability to pay at least $54,300 and perhaps more of the purchase price, even if we agree with respondent as to the balloon payment of $401,700. In fact, petitioner paid over $79,300 of the purchase price by the end of 1976 when he ceased making principal payments. In our view, the question of the balloon payment, which we will discuss later, is not a question of whether petitioner purchased the film but rather is a question of the amount that petitioner paid for the film and the amount to be used in determining its basis to petitioner for purposes of depreciation. Finally, respondent argues in great detail the remedies available upon default of payment by petitioner. However, remedies upon default in payment of an item purchased on an installment basis deal not with whether the purchaser has purchased the item but rather with the rights of the parties upon a default. *523 We have considered all of respondent's arguments and conclude that petitioner did purchase the film "Moonchild" and the transaction should be treated for tax purposes as a purchase and sale. In Grodt & McKay Realty, Inc. v. Commissioner,77 T.C. 1221, 1237-38 (1981), we stated: The term "sale" is given its ordinary meaning for Federal income tax purposes and is generally defined as a transfer of property for money or a promise to pay money. Commissioner v. Brown,380 U.S. 563, 570-571 (1965). The key to deciding whether petitioners' transactions with Cattle Co. are sales is to determine whether the benefits and burdens of ownership have passed from Cattle Co. to petitioners. This is a question of fact which must be ascertained from the intention of the parties as evidenced by the written agreements read in light of the attending facts and circumstances. Haggard v. Commissioner,24 T.C. 1124, 1129 (1955), affd. 241 F.2d 288 (9th Cir. 1956). [Fn. ref. omitted.] Some of the factors which have been considered by courts in making this determination are: (1) Whether legal title passes ( Commissioner v. Segall,114 F.2d 706, 709 (6th Cir. 1940), *524 cert. denied 313 U.S. 562 (1941); Oesterreich v. Commissioner,226 F.2d 798, 802 (9th Cir. 1955)); (2) how the parties treat the transaction ( Oesterreich v. Commissioner,supra at 803); (3) whether an equity was acquired in the property ( Haggard v. Commissioner,241 F.2d 288, 289 (9th Cir. 1956); Oesterreich v. Commissioner,supra at 803; see Mathews v. Commissioner,61 T.C. 12, 21-23 (1973), revd. 520 F.2d 323 (5th Cir. 1975), cert. denied 424 U.S. 967 (1976)); (4) whether the contract creates a present obligation on the seller to execute and deliver a deed and a present obligation on the purchaser to make payments ( Wiseman v. Scruggs,281 F.2d 900, 902 (10th Cir. 1960)); (5) whether the right of possession is vested in the purchaser ( Wiseman v. Scruggs,supra at 902; Commissioner v. Segall,supra at 709); (6) which party pays the property taxes ( Harmston v. Commissioner,61 T.C. 216, 229 (1973), affd. 528 F.2d 55 (9th Cir. 1976)); (7) which party bears the *525 risk of loss or damage to the property ( Harmston v. Commissioner,supra at 230); and (8) which party receives the profits from the operation and sale of the property ( Harmston v. Commissioner,supra at 230). * * * In the instant case petitioner acquired title to the property. Petitioner had a present obligation to make certain payments. Petitioner had the right to possession of the property with certain limitations contained in the distribution agreement. Petitioner acquired rights to the property subject to a lien, with the right to release the property in payment of the final installment if the receipts from the property had not been sufficient over a 10-year period to make the final payment. This was not a situation where no payments other than interest would ever be required of petitioner. Cf. Estate of Franklin v. Commissioner,544 F.2d 1045 (9th Cir. 1976), affg. 64 T.C. 752 (1975). Respondent's next argument is that the documents whereby petitioner purchased the film "Moonchild" and entered into an agreement for its distribution with AFB should be ignored for tax purposes because there is no *526 economic reality to the agreements but in substance they are a mere sham.This is an affirmative allegation made by respondent in his amended answer. He has the burden of proof on this issue.We conclude that the evidence does not support respondent's position. Petitioner paid out $79,300 principal on the purchase price of the film and a $29,300 initial payment toward the expenses of its distribution. Regardless of whether the film was worth the $490,000 recited as the purchase price in the purchase and sale agreement, it is clear that this film had some value, as will be later discussed. It is true that the record shows that there would be substantial costs connected with the distribution of the film, but the record also shows that there was some distribution. Suffice it to say, that on the basis of this record respondent has totally failed to carry his burden of showing that the transaction was a sham. Respondent argues that petitioner is paying $490,000 for a film which AFB is acquiring at the same time for a little over $34,000. He argues that this shows the lack of economic reality, citing Thompson v. Commissioner,66 T.C. 1024, 1051 (1976). In the Thompson *527 case we stated that a resale of property within 3 months of its purchase at 10 times the purchase price causes the "bona fides" of the transaction to be suspect. However, respondent in this case ignores some of the provisions of the agreement whereby AFB acquired the film or deliberately misrepresents them. The $34,000-plus paid by AFB was cash paid toward the film.There was a further provision for a payment of up to $375,000 from distribution proceeds received by AFB for the film after the film was sold to a limited partnership. As we have previously stated, it is clear that AFB was buying the film for resale with a distribution agreement. In our view, the $34,000-plus cash payment was not indicative of the fair market value of the film. The stated sales price of $490,000 with $401,700 conditioned on receipts from distribution of the film is to be compared with a conditional purchase price of $375,000. The $88,300 of petitioner's recourse liability for the purchase price of the film is comparable to the $34,000-plus cash payment by AFB for the film. While this is a large markup in price, it is not an unreasonable increase as was the situation in Thompson v. Commissioner,supra. *528 Respondent also argues that Mr. Alexander's control over changes that might be made in the film is inconsistent with petitioner's receiving all right, title and interest to the film, and shows that the transaction did not have economic reality. In our view, the control over changes in the film retained by Mr. Alexander were relatively minor. Respondent argues that Mr. Alexander did not have the authority to enter into the agreement with AFB for sale and distribution of the film and that for this further reason the agreement between petitioner and AFB lacked economic reality. However, the corporation which Mr. Alexander represented in entering into this agreement was the general partner in a limited partnership in which CFI was the limited partner. As between AFB and the partnership which owned the film, the general partner would be assumed to have a right to enter into the transaction that Mr. Alexander entered into with AFB. In fact, CFI later recognized this fact and accepted the agreement with AFB for the sale and distribution of the film. While it is true, as respondent contends, that AFB could not have sold the film to petitioner before purchasing it, we have concluded *529 that the agreement between petitioner and AFB was not entered into until December 31, 1973, after AFB had acquired the film. Finally, respondent argues that if the sale was not a sham, the nonrecourse balloon payment should not be considered as a part of the purchase price of the film for depreciation purposes. Respondent contends that this nonrecourse conditional obligation unreasonably exceeds the value of the film. Respondent relies on Estate of Franklin v. Commissioner,supra, for the proposition that nonrecourse obligations which, when created, unreasonably exceed the value of the property to which the obligee must look for payment should not be recognized as debts for tax purposes.He also cites Siegel v. Commissioner,78 T.C. 659 (1982); Narver v. Commissioner,75 T.C. 53 (1980), affd. per curiam 670 F.2d 855 (9th Cir. 1982); and Beck v. Commissioner,74 T.C. 1534 (1980), affd. 678 F.2d 818 (9th Cir. 1982), in support of this contention. It should be pointed out here that respondent in the notice of deficiency determined that for depreciation purposes the film "Moonchild" had *530 a value of only $34,300 and therefore the burden is on petitioner to show a greater value, and the burden is also on petitioner to show that the nonrecourse obligation should be a part of the basis of the motion picture for purposes of depreciation.
In our view, because of the letter agreement of December 31, 1973, between petitioner and AFB, the final $401,700 of the stated purchase price of the film clearly was nonrecourse liability. Its payment was dependent solely upon the amount received from distribution of the film and if sufficient funds were not received from distribution of the film, the return of the film satisfied the obligation. Under the holdings in the cases cited by respondent, where the sales price of property exceeds its fair market value by an unreasonable amount (or when the principal amount of an indebtedness unreasonably exceeds the value of the property securing the debt), [3] a nonrecourse obligation cannot be considered as part of the basis of property for depreciation purposes.
There is testimony in the record by three experts as to the *531 value of the film "Moonchild." Respondent's expert witness valued the film at $30,000, and petitioner's expert witnesses valued the film at between $600,000 to $800,000. In our view, there were many assumptions in the testimony of petitioner's experts that are contrary to the facts in this record. For this reason their valuation of the film is unrealistic and of little value. Petitioner's expert witnesses made their estimate of the fair market value of the film "Monnchild" by viewing the film. They gave no consideration to the unsuccessful efforts for distribution of the film by the producer or to the distribution agreement that existed between AGA, Inc. and AFB with respect to the film. Their estimates were based on their opinion that $1 million would be spent on the costs of distributing the film. The actual facts show that Mr. Alexander had attempted for a year and a half to find someone to distribute the film. He had attempted to obtain a distribution contract with a relatively small amount of cash payment, but his efforts had proved unsuccessful. Mr. Alexander showed the film to many prospective distributors but was unable to find a distributor for the film. He sold the *532 film to AFB because there was a threat by the laboratory to which approximately $35,000 was owed to foreclose on the film. The only cash payment for the film was the unpaid laboratory fee. In addition, Mr. Alexander's partnership was to receive 70 percent of net proceeds up to $275,000, 50 percent for another $100,000, and thereafter 30 percent. In order to obtain this agreement, it was necessary for AGA, Inc. to grant to AFB the right to resell the film. After making a diligent effort to have the film distributed, the only actual showing other than to prospective distributors or exhibitors was the five-day showing in Riverside, California, which resulted in net proceeds to Mr. Alexander's partnership of $1,700. Petitioner's experts claimed that with "proper distribution" the film would be worth amounts ranging between $600,000 and $800,000, but did not define proper distribution or show any inadequacy in Mr. Alexander's efforts to find a distributor for the film. Mr. alexander testified that he had hoped, and had estimated, that perhaps he could enter into some form of distribution agreement where, over the lifetime of the film, he would receive around $370,000. He was unable *533 to obtain this amount. When petitioner purchased the film, this history of rejection of it by all prospective distributors or exhibitors would adversely affect its value. Also, clearly, under the distribution agreement between petitioner and AFB, only a small amount was to be spent on the distribution of the film. AFB, under this agreement, was not obligated to spend anything approximating $1 million in efforts to distribute the film, nor was it contemplated that any such amount would be expended. After careful consideration of the estimates made by petitioner's experts, in our view those estimates were made without foundation in fact and without consideration of the actual circumstances surrounding the sale and distribution of the film. On the other hand, respondent's expert made his estimate of approximately $62,000 income from "Moonchild," to be split between the owner of the film and the distributor, on the basis that there was no market for the film in the television or theatrical markets in the United States. Mr. Landry's testimony with respect to running the film as a second film in connection with television sales indicated that there was some market for the film for *534 television in the United States, and also the record shows that in art theaters, college theaters and theaters in primarily college towns there would be some theatrical market. For this reason, it appears that respondent's expert witness' estimate of $25,000 to $30,000 as the fair market value of the film in 1973 is on the low side, although it is much better founded in fact than are the estimates of petitioner's experts. Petitioner unconditionally agreed to pay a minimum of $54,300 for the film plus additional amounts unless the tax effects of the transaction were questioned by the Internal Revenue Service, bringing the total payment exclusive of the $401,700 balloon nonrecourse payment to $88,300. This record clearly shows that petitioner was greatly motivated by the tax benefits to be derived from the purchase of the film. However, in the instant case there is no issue raised by respondent either in the deficiency notice or in his amended answer as to whether petitioner entered into the transaction for profit. In effect, respondent, by allowing a small amount of depreciation, the interest deduction claimed in 1973 with respect to the purchase of the film and apparently, except *535 for the argument with respect to the film's not being new "section 38" property, recognizing the right to investment credit in the notice of deficiency, assumed a profit motive. [4] Respondent did by amended answer raise a question as to ownership of the film, but at no point did respondent contend that the transaction was one not entered into by petitioner for profit. Petitioner, under his contract for making of payments other than the balloon payment of $401,700, was required to pay the 1974 amounts totaling $54,300 before he could cease payments because of the Internal Revenue Service's questioning the tax effects of the transaction. We conclude that even though the fair market value of the film may be a little below the $79,300 of cash payments on principal made by petitioner, the amount of $79,300 actually paid by petitioner in principal amounts on the film was not unreasonably above its fair market value. These payments were made from 1973 through 1976. They were a recourse obligation by a person able to make the payments. The provision of payments ceasing if the Internal Revenue Service disallowed the expected tax deductions could not reasonably be expected to affect the *536 making of the payments until sometime in 1976. On the basis of this record, we conclude that petitioner's basis in the film did not include the nonrecourse, contingent $401,700 balloon payment or the $9,000 which petitioner refused to pay after the tax effects of his purchase were questioned by the Internal Revenue Service. Absent an extension of time, the statute with respect to the year 1973 would have expired on April 15, 1977. Therefore, some contingency did exist with respect to the payment of any principal amounts after 1976. Petitioner had a cash investment in the film of $79,300, which the record shows was its approximate fair market value. See Siegel v. Commissioner,supra at 684. See also, Brannen v. Commissioner,78 T.C. 471, 493 (1982), affd. 722 F.2d 695 (11th Cir. 1984). This amount of $79,300, while on the high side of the fair market value of the *537 film as determined from the evidence, is sufficiently close to its fair market value to be considered to be petitioner's investment in the film. We therefore conclude that petitioner had a basis for depreciation in the film of the $79,300 he paid in cash on the principal of the purchase price of the film.
Respondent next argues that no depreciation should be allowed for the year 1973 on the film "Moonchild" since the film was not "placed in service" in that year either by petitioner or AFB. Respondent argues that petitioner is entitled to no depreciation for the film "Moonchild" in 1973 because he did not acquire an ownership interest in the film in 1973, and the film was not used commercially until well into 1974 and was not ready to be so used. Respondent argues that as defined in section 1.48-8(a)(5), Income Tax Regs., a film is not "placed in service" until it is exhibited before the primary audience for which it was intended. Section 1.48-8(a)(5) of the regulations defines the term "placed in service" for the purposes of a qualified film to be entitled to investment tax credit. In fact, section 48 of the Code and section 1.48-8 of the regulations deal with investment tax credit, *538 and section 48(k), as will be further hereinafter discussed, deals with the investment tax credit with respect to movie and television films. Section 48(k)(1)(B) defines the term "qualified film" for this purpose. In our view, section 1.48-8(a)(5) of the regulations, in defining "placed in service," is dealing with a qualified film placed in service for the purpose of the investment tax credit. This provision does provide that a qualified film is "placed in service" when it is first exhibited or otherwise utilized before the primary audience for which the qualified film was created. In our view, this definition relates only to a qualified film for investment tax credit purposes and does not change the general definition of the time when property is considered to be business property for depreciation purposes.Under the provisions of section 167, depreciation is allowed on property used in a trade or business or property held for the production of income. Section 1.167(a)-10(b), Income Tax Regs., provides with respect to depreciation that "The period for depreciation of an asset shall begin when the asset is placed in service and shall end when the asset is retired from service." *539 This regulation does not define "placed in service." Generally it has been held that depreciation may be taken on an item when it is completed and ready for service in a trade or business or ready for use for production of income. See S.M.C. Corporation v. United States,675 F.2d 113 (6th Cir. 1982); Wisconsin Psychiatric Services, Limited v. Commissioner,76 T.C. 839, 853 (1981). Respondent has pointed to nothing which would indicate that for depreciation purposes there should be any different rule with respect to a motion picture film than with respect to other property. The very fact that petitioner simultaneously with the purchase of the film "Moonchild" entered into an agreement to have AFB distribute the film clearly shows that from the date of purchase of the film petitioner had it available to be used in his business or to produce income, and for that reason should be entitled to depreciation.As we have previously held, petitioner acquired the film on December 31, 1973, and therefore in the year 1973 is entitled to only one day's depreciation on the film. However, if this amount is less than the depreciation allowed by respondent in the notice *540 of deficiency, which it appears it will be, petitioner is entitled to the amount of depreciation allowed in the deficiency notice since respondent in his amended answer made no claim for an increased deficiency. Respondent argues that even if petitioner is entitled to some depreciation on the film "Moonchild" in 1973, he is not entitled to any investment tax credit in that year because the film "Moonchild" is not "new section 38" property in petitioner's hands as required by section 48(k)(1)(A)(i), and therefore petitioner is not entitled to an investment tax credit on a film. Section 48(k)(1)(A)(ii) provides that a credit shall be allowed under section 38 with respect to a motion picture film only if such film is "new section 38" property, which is a qualified film. See Siegel v. Commissioner,supra at 695, 696. Section 48(k) was enacted by section 804, Tax Reform Act of 1976, Pub.L.94-455,90 Stat. 1591. Section 804(d) of the Tax Reform Act of 1976, supra, states as follows: Entitlement to Credit.--Paragraph (1) of section 48(k) of the Internal Revenue Code of 1954 (relating to entitlement to credit) shall apply to any motion *541 picture film or video tape placed in service in any taxable year beginning before January 1, 1975. [90 Stat. 1596] It is therefore clear that section 48(k) is applicable to a motion picture film for years prior to the date of enactment of the section. In other words, the provision that a motion picture film shall be entitled to investment tax credit only if it is "new section 38" property applies with respect to the film "Moonchild" here involved. We have held the retroactive application of this section to be appropriate. See Siegel v. Commissioner,supra at 696. In the recent case of Fife v. Commissioner,82 T.C. 1 (1984), we pointed out that the taxpayers contended that the retroactive application of section 48(k) to their investment in a motion picture denied them due process of law and that the Commissioner had no authority to promulgate regulations for the retroactive application of that section. There we stated, at page 12: A retroactive statute is not of itself unconstitutional unless it violates the due process clause. Stockdale v. Insurance Companies,87 U.S. (20 Wall.) 323, 331 (1873). Although taxpayers *542 have often argued that the retroactive application of an income tax statute creates an injustice, in light of the decided cases it is well established that Congress possesses the constitutional power to make an income tax statute retroactive. In point of fact, most provisions of the 1939 and 1954 Codes were made retroactive to the beginning of the taxable years in which they were passed. * * * In the Fife case we concluded that section 48(k) was properly made retroactive. Section 1.48-8(a)(2), Income Tax Regs., provides in part: Once a qualified film is placed in service in any medium of exhibition in any geographical area of the world, it becomes used property and no investment credit with respect to the film is available to a taxpayer that acquires the film after that time (except for subsequently incurred costs described in paragraph (e)(9) of this section which the taxpayer incurs).* * * The term "placed in service" as defined in section 1.48-8(a)(5), Income Tax Regs., provides that a qualified film is placed in service when it is first publicly exhibited for entertainment purposes, but that it is not placed in service merely because it is completed and *543 in a condition or state of readiness and availability for exhibition or merely because it is exhibited to prospective distributors, exhibitors, sponsors or purchasers or is shown in a "sneak preview" before a select audience. The record here shows that "Moonchild" was shown on a number of occasions in 1972 before prospective exhibitors or distributors, but under the regulation these showings would not be considered placed in service so as to make the picture used section 38 property. The question is whether the showing on five consecutive nights of the film in Riverside, California, was a utilization before the primary audience for which the qualified film was created. The record shows that the fact that the film would be shown for five nights was advertised to the public, tickets were sold to the public, and the purpose of the showing of the film, as far as the producer of the film was concerned, was to make a profit on the film. Although a society sponsored the showing of the film, the audience was not a select audience of the society. The audience was composed of members of the public who cared to come and view the film. Much stress was placed by the experts who testified in *544 this case on the fact that "Moonchild" was a type of "cult" film which would have appeal only to limited audiences such as college students. In our view, the five-day showing of this film in a public theater to any member of the public who cared to purchase a ticket and view the film was an exhibition of the film before the primary audience for which the film was created. We therefore conclude that the film "Moonchild" had been placed in service within the meaning of section 48(k) in 1972 and was used section 38 property when it was acquired by petitioner. For this reason, petitioner is not entitled to an investment tax credit with respect to the film. However, we again point out that to the extent respondent allowed any investment tax credit on the film to petitioner in the notice of deficiency, petitioner is entitled to the credit since respondent has made no claim for an increased deficiency. Petitioner argues that respondent made a second inspection of his books. Apparently, according to the testimony of petitioner's accountant, sometime in 1976, although the accountant was not sure of the date, a Revenue Agent came to see him and asked to see petitioner's records.The accountant, *545 after talking with petitioner's attorney, furnished the records to respondent's agent. The record in this case establishes that petitioner's accountant voluntarily furnished the books and records to the agent. Therefore, there was no prohibited second inspection of petitioner's records. See United States v. Baker,451 F.2d 352 (6th Cir. 1971), and cases there cited. The only evidence with respect to the $45,000 payment which respondent determined petitioner received on an installment note in 1971 is petitioner's testimony that he did not remember receiving the amount. He did not testify that he did not receive it. Since the burden of proof with respect to this issue is on petitioner, he has totally failed to carry that burden. The final issue in this case is the claimed deduction by petitioner of $29,300 paid to AFB as a management fee. The distribution agreement entered into by petitioner and AFB provides that in consideration of AFB's agreement to act as promoter and distributor of the film "Moonchild," petitioner agrees to pay to AFB "an initial management fee equal to the sum of Twenty-nine Thousand Three Hundred Dollars ($29,300.00) payable upon execution *546 hereof." The agreement for promotion and distribution of the film "Moonchild" entered into between petitioner and AFB had no definite time period or termination date. In our view, the provision of the contract indicates that the $29,300 was a management fee payable for management services over the term of the distribution agreement. The burden with respect to this issue is on petitioner, and he has made no showing that the $29,300 was with respect to expenses of management in 1973. The indication is entirely to the contrary. Since there was no definite term of the distribution agreement, the management fee was properly capitalized by respondent over a 10-year period since it apparently was contemplated by the provision in the agreement for purchase and sale of the picture that the final termination date of a useful life of the picture would be in 1983. Respondent determined a 116-month period for amortizing the management fee, running from September 30, 1973, through June 30, 1983.[5] However, since we have determined that petitioner did not acquire the film "Moonchild" until December 31, 1973, only one day's management fee would be proper for the year 1973. However, respondent *547 made no claim that he did not properly allow the $758 deduction for amortization of the management fee. This $758 was arrived at by multiplying $29,300 by 3/116. Since respondent in the notice of deficiency allowed this $758 deduction in 1973 and made no affirmative allegation that this portion of the deduction was improperly allowed, we hold that the amount of $758 allowed in the deficiency notice is the amount of the $29,300 payment petitioner may deduct in 1973 and that respondent properly disallowed the remaining $28,542 of this claimed expense in 1973. Petitioner argues that because any deficiency for the year 1971 is barred by the statute of limitations, respondent cannot properly recompute the tax for that year for the purpose of determining the extent of the absorption of any investment credit carryback to that year. Since we have held that petitioner is not entitled to any investment credit with respect to the film "Moonchild, *548 " it is clear that any investment credit to which petitioner is entitled for the year 1973, which would be the amount allowed by respondent in the notice of deficiency, will be used in the year 1973 and will not be available for a carryback to 1971 or 1972. Therefore, because of our holding in this regard, the issue of recomputing the tax for 1971 for purposes of determining the investment tax credit carryover to 1972 is moot. Decision will be enteredunder Rule 155.
Footnotes
1. Unless otherwise stated, all statutory references are to the Internal Revenue Code of 1954, as amended and in effect during the years here in issue. ↩
2. For the year 1973 respondent did not disallow the $5,700 interest deduction petitioner claimed with respect to the film "Moonchild." We conclude that the $69,300 paid by petitioner on December 31, 1973, consisted of $29,300 management fee, $5,700 interest and $34,300 principal. For the years 1974, 1975, 1976 and 1977, payments made by petitioner to AFB are $37,961, $36,410, $30,790 and $12,705, respectively. On his returns for 1974, 1975, 1976 and 1977, petitioner deducted as interest paid with respect to the purchase of "Moonchild" the amounts of $17,961, $21,410, $20,790 and $15,180, respectively, or a total of $75,341. We therefore assume that the difference in the total payments in each year and the amount claimed as an interest deduction in that year is a principal payment. The total payments in 1977 are less than the interest deduction claimed. We therefore conclude that no principal payment was made in 1977, and that from 1973 through 1976 petitioner paid a total of $79,300 as principal for the purchase of the film "Moonchild." The only income reported by petitioner from the film "Moonchild" was $10,689 reported in 1976.↩
3. Odend'hal v. Commissioner,80 T.C. 588, 604↩, n.7 (1983), on appeal (4th Cir., Dec. 19, 1983).
4. In the recent case of Burpee v. Commissioner,T.C Memo. 1983-710↩, we held a purchase of a film by the taxpayer from AFB under agreements indistinguishable from those involved in the instant case not to be a transaction entered into for profit.
5. We realize that a correct calculation of the number of months from September 30, 1973, through and including June 30, 1983, is 117.However, in his statutory notice of deficiency respondent calculated the period to include only 116 months.↩